UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

DBT GMBH and DBT AMERICA, INC.,

              Plaintiffs,

    - against -

J.L. MINING CO., THE MARMON GROUP LTD.,
MARMON WIRE & CABLE LLC, AND GATEWAY
AUSTRALIAN HOLDINGS PTY LIMITED

              Defendants.

------------------------------------------X

06 Civ. 448 (RWS)

O P I N I O N



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4|8|08

**Appearances**

    Attorneys for Plaintiffs

    DELBELLO DONNELLAN WEINGARTEN TARTAGLIA
    The Gateway Building, One North Lexington Avenue
    White Plains, NY   10601
    By: BRIAN T. BELOWICH

    BAKER & MCKENZIE
    1114 Avenue of the Americas
    4th Floor
    New York, NY   10035
    By: KATHRYN M. RYAN

    BABST, CALLAND, CLEMENTS AND ZOMNIR, P.C
    Two Gateway Center
    8th Floor
    Pittsburgh, PA 15222
    By: JOSEPH DECKER

    Attorneys for Defendant

    FULBRIGHT & JAWORSKI L.L.P.
    666 Fifth Avenue - 30th Floor
    New York, NY 10103
    By: JAMES H. NEALE

**Sweet, D.J.,**

Plaintiffs DBT GmbH and DBT America, Inc. (collectively, "DBT" or the "Plaintiffs") have moved for partial summary judgment and defendants J.L. Mining Company, The Marmon Group Ltd., and Marmon Wire & Cable LLC (collectively, "Marmon" or the "Defendants") have moved for summary judgment in this diversity contract action. For the reasons stated below, both motions are granted in part and denied in part.

## Prior Proceedings

Plaintiffs filed their initial Complaint on January 20, 2006, asserting claims for breach of contract and breach of guaranty, and seeking a declaratory judgment. Discovery commenced, and Plaintiffs filed an Amended Complaint on March 19, 2007. The instant motions were filed on June 15, 2007, and marked fully submitted on September 11, 2007.

## Facts

Unless otherwise noted, the facts have been set forth in the Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 in Support of Defendants' Motion for Summary Judgment (the "Marmon Stmt."), the Plaintiffs' Concise Statement of

2

Undisputed Material Facts in Support of Plaintiffs' Motion for Summary Judgment (the "DBT Stmt."), Defendants' Counter-Statement Pursuant to Local Civil Rule 56.1 in Opposition to Plaintiffs' Motion for Summary Judgment (the "Marmon Opp. Stmt."), and Plaintiff's Response Disputing Defendants' Separate Statement of Undisputed Facts (the "DBT Opp. Stmt.").1 Except as otherwise noted, the facts are not in dispute.

In this action, DBT seeks damages for alleged breaches by Marmon of certain contractual obligations set forth in the parties' Global Purchase Agreement ("GPA"), which was dated and effective July 6, 2001. Marmon Stmt. ¶ 3; GPA (Dep. Exs. 7, 215). Under the GPA, one or more defendants (called "Sellers") sold the following to plaintiffs DBT America and/or DBT Germany (called "Purchasers"): (a) the assets of Long-Airdox Company ("LAD America"), a Delaware corporation, and (b) the stock of (i) Long-Airdox Asia, Inc., (ii) Long-Airdox Australia Pty Limited and (iii) Long-Airdox Limited (collectively with LAD America referred to herein as "LAD"). Marmon Stmt. ¶ 4.

At the time of the above-referenced purchase and sale under the GPA ("Sale"), LAD America was engaged in the business of designing, manufacturing and marketing underground mining equipment

1 Where either party's Rule 56.1 statement is cited for a proposition of fact, the fact is either admitted or undisputed. Particularly helpful in this regard was Defendants' Compilation of Marmon's Local Civil Rule 56.1 Statement

3

in the United States. Long-Airdox Asia, Inc., Long-Airdox Australia Pty Limited, Long-Airdox Limited and certain of their affiliated entities (together, the "Transferred Entities") were engaged in similar businesses outside the United States. Id. ¶ 5.

According to DBT, the obligations allegedly breached by Defendants were, principally, to indemnify or pay DBT for losses suffered by DBT as a result of certain liabilities retained by "Sellers" under the GPA, "such as product warranty costs related to products sold to customers by Sellers, settlement of claims and litigation related to equipment sold to customers by Sellers, environmental remediation costs, and taxes which accrued to Sellers when they were operating the businesses." Id. ¶ 6; Am. Compl. ¶¶ 2, 13. DBT's claims relating to environmental remediation costs have been settled, and DBT has withdrawn its claims for certain other items, which Marmon had paid prior to the commencement of this action. Marmon Stmt. ¶ 7; Neale Decl. ¶ 15.

On its motion, DBT seeks partial summary judgment on its claims concerning: (a) the Shenhua Settlement; (b) the Majiliang modular coal preparation plant; and (c) the Brambles claim. See generally DBT Stmt. ¶¶ 5-54. On its motion, Marmon seeks summary judgment dismissing DBT's remaining claims concerning the following subjects: (a) the Shenhua Settlement; (b) the Majiliang modular

and DBT's Responses, Color-Coded To Show DBT's Admissions.
4

coal preparation plant; (c) the Rocksprings Feeder Breakers; and
(d) the Peabody Un-A-Haulers. Marmon Stmt. ¶ 8. Marmon also seeks
summary judgment dismissing the Complaint on the grounds that DBT
has breached the parties' covenant of cooperation and the implied
covenant of good faith and fair dealing. Marmon Mot. Summ. J. 28-
29.

**The Parties**

Plaintiff DBT America is a wholly owned subsidiary of DBT
Germany. It is engaged in the business of manufacturing, selling
and servicing underground mining equipment worldwide, primarily for
the coal industry. Marmon Stmt. ¶ 9.

Plaintiff DBT Germany is the parent of DBT America. Both
itself and through its subsidiaries, it manufactures, sells and
services underground mining equipment worldwide, primarily for the
coal industry. Id. ¶ 10.

Defendant JL Mining is the entity formerly known as the
Long-Airdox Company, which was a signatory to the GPA. Its name
was changed after the Sale, pursuant to ¶ 3.11(a) of the GPA. JL
Mining is a corporation organized and existing under the laws of
the State of Delaware. Id. ¶ 11.

5

Defendant Marmon Wire & Cable is successor to The Corporation, which was a signatory to the GPA. It is a limited liability company organized and existing under the laws of the State of Delaware. Id. ¶ 12.

Defendant Marmon Group was a signatory to the GPA. It is organized under the laws of the United Kingdom. Id. ¶ 13.

**The GPA**

**(a) General Provisions**

The GPA is, by its terms, to be governed, construed and enforced under New York Law. Id. ¶ 36; GPA ¶ 9.6.

**(b) Purchase Price and Adjustments**

Pursuant to GPA ¶ 1.5(b), the price paid by DBT in connection with the closing of the GPA was $60,899,000. Under GPA ¶ 1.5(c), the purchase price for the Business was to be adjusted, within certain limits; in or around January 2002, the parties agreed upon a downward adjustment to the purchase price of $2,786,000. Marmon paid the $2,786,000 purchase price adjustment to DBT, and upon Marmon doing so, all matters concerning

6

determination of the Final Purchase Price under ¶ 1.5(c) of the GPA were resolved. Marmon Stmt. ¶ 15-17.

Under GPA ¶ 3.14, Marmon guaranteed, until the first anniversary of the Closing Date, DBT's collection of 80% of the accounts receivable shown on the Closing Balance Sheet. Id. ¶ 19. GPA ¶ 3.14 states:

> **3.14 Accounts Receivable.** The Purchasers shall use commercially reasonable efforts, in accordance with the Purchasers' customary policies and procedures, to collect all accounts receivable shown on the Closing Balance Sheet; provided, however, that the Purchasers shall not allow any claim against or agree to any reduction in or set off against any such receivable in excess of $5,000 without the Sellers' prior written consent. In the event that, as of the first anniversary of the Closing Date, the Purchasers shall have collected less than 80% of the aggregate dollar amount of such accounts receivable, net of the reserves shown on the Closing Balance Sheet (the "Guaranteed Amount"), the Purchasers shall so notify the Sellers in writing, and the Sellers shall promptly pay to the Purchasers an amount equal to the difference between the aggregate dollar amount collected by the Purchasers with regard to such accounts receivable and the Guaranteed Amount.

GPA ¶ 3.14. As of June 25, 2002, DBT had collected 85% of the accounts receivable shown on the Closing Balance Sheet. Marmon Stmt. ¶ 19.

## (c) Retained Liabilities

Under GPA ¶ 3.13A(a), LAD was required to terminate the

7

employment of all its employees who were actively at work on the Closing Date and DBT was required to make offers of employment to all terminated employees except for three named individuals, including David Kennedy. As a result, after the Closing Date, JL Mining (f/k/a LAD) was no longer an operating business. Id. ¶ 21.

GPA ¶ 1.4 reflects the parties agreement with regard to apportionment of LAD's contingent liabilities. That provision states:

### 1.4 **Assumed Liabilities**

(a) At the Closing, the Purchasers shall assume and agree to pay, perform and discharge (i) all liabilities shown on the Closing Balance Sheet (except for any accrued liabilities for post retirement medical benefits and/or life insurance on the Closing Balance Sheet), and (ii) all of the obligations of LAD or the Transferred Entities arising or to be performed after the Closing under the Acquired Contracts (collectively, the **"Assumed Liabilities"**).

(b) Except for the Assumed Liabilities, the Purchasers are not assuming, and the Sellers hereby acknowledge that, in further consideration of the Final Purchase Price, they are retaining, all of the Liabilities of LAD or the Transferred Entities (collectively, the **"Retained Liabilities"**), and the Sellers covenant that they shall pay, discharge and perform each of the Retained Liabilities promptly when due, except to the extent contested by the Sellers in good faith by appropriate proceedings. For the avoidance of doubt, it is understood and agreed by the Sellers and the Purchasers that the Retained Liabilities shall include any and all liabilities (other than the Assumed Liabilities) relating to the Business arising from or relating to events and circumstances occurring or existing prior to the Closing Date including, without limitation, liabilities relating to: . . .

8

litigation; . . . warranty or product liability
claims relating to products manufactured prior to
the Closing Date (including, by way of
clarification, modular coal preparation plant
projects completed prior to the Closing Date);
provided, however, that with respect to products
manufactured but not sold prior to the Closing
Date, the Sellers shall be liable only to the
extent a warranty or product liability claim
relates to a defect in the product that exists as
of the Closing Date; . . . breaches of contract . .
. .

GPA ¶ 1.4.

#### (d) Indemnification procedures

Article VII of the GPA sets forth procedures for
indemnification by Marmon with respect to, among other things, (i)
any breach of Sellers' covenants in the GPA, and (ii) any of the
Retained Liabilities. Marmon Stmt. ¶ 27. Article VII also sets
forth procedures for indemnification by DBT with respect to, among
other things, (i) any breach of Purchasers' covenants in the GPA,
and (ii) any of the Assumed Liabilities. Marmon Stmt. ¶ 28.

To obtain indemnification from Marmon with respect to any
direct or third-party claim, DBT is required under GPA Article VII
to provide Marmon with prompt notice thereof, "specifying the
nature of such claim and the amount or the estimated amount
thereof, to the extent then feasibly ascertainable. Id. ¶ 30.

9

Section 7.6 of the GPA sets forth the effect of failure

by an Indemnified Party to give timely notice.    That section

provides that:

> a failure by an Indemnified Party to give timely
> complete or accurate notice as required under
> Section 7.3 or 7.4 shall not affect the right or
> obligations of any party hereunder except and only
> to the extent that, as a result of such failure any
> party entitled to receive such notice was deprived
> of its right to recover any payment under its
> applicable insurance coverage or was otherwise
> damaged or prejudiced as a result of such failure
> to give timely notice.

Id. ¶ 31.


### (e) Warranty Procedures


The GPA made additional, specific provision for Retained

Liabilities arising under warranties for products made or sold

before the Closing, as follows:

> After the Closing, the Purchasers, on behalf and
> for the account of the Sellers, shall undertake
> warranty repairs or replacements relating to
> products manufactured, sold or delivered or
> services rendered by LAD and the Transferred
> Entities on or prior to the Closing Date in
> accordance with LAD's and the Transferred Entities'
> standard warranties for such products or as
> otherwise required by Law or contract (the
> "Warranty Obligations"); provided, however, that
> the Purchasers shall not undertake the fulfillment
> of any Warranty Obligation without the Sellers'
> prior approval if the estimated reimbursable cost
> thereof would be in excess of $5,000.    The Sellers
> shall reimburse the Purchasers for the direct costs
> (inclusive of actual costs of materials and labor,
> including a reasonable charge for overhead)
> incurred by the Purchasers in fulfilling the

10

Warranty Obligations. The Purchasers shall promptly notify the Sellers of any Warranty Obligations of which they become aware (other than from the Sellers).

Id. ¶ 32.

#### (f) Amendment

The GPA provides as follows with respect to Amendments

and Waivers:

> This Agreement may not be amended, modified or supplemented except by written agreement of the parties hereto. No waiver by any party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

GPA ¶ 9.2.

### DBT's Submission of Warranty and Retained Liability Claims

After the July 6, 2001 Closing Date of the GPA, DBT's Dorothea Gattineau circulated internally by email a document entitled "Guideline - Handling of 'Excluded Liabilities'" ("Guideline"). Among other things, the Guideline states: "If the warranty cost will be 5,000 USD or more, the Contactperson has to ask Marmon for prior approval to settle the claim. . . . If we undertake the fulfillment of those warranty obligation[s] without

11

prior approval we weaken our legal position. That is why the rule to gain prior approval (over 5,000 USD) should only be suspended in exceptional cases and with the approval from the CFO of your company." Marmon Stmt. ¶ 53; Dep. Ex. 113.

In August 2001, shortly after the Sale, DBT began submitting claims for reimbursement of purported warranty expenses. DBT submitted claims for reimbursement of warranty expenses exceeding $5,000 in connection with a "Warranty Claim Form" with accompanying documentation. In addition to such forms, DBT submitted spreadsheets to Marmon itemizing, on a monthly basis, purported warranty expenses that DBT America claimed were reimbursable under the GPA. Each such monthly summary had sections entitled (a) "OVER $5,000 (see Attached Warranty Form 1 for approval & details)" and (b) "Under $5,000 Standard." Id. ¶¶ 38, 39, 41.

In or around February, 2002, the parties agreed on additional procedures with regard to DBT's warranty claims submitted to Marmon in a document titled "Additional DBT Warranty Policy Procedures For Submission to Marmon," which states, in part: "All warranty procedures as set forth in the contract continue as requirements for reimbursement by Marmon. In addition the following clarifications and procedures are to be considered additional requirements for warranty reimbursement by Marmon."

Dep. Ex. 17.

## **The Shenhua Settlement**

The accounts receivable of LAD and the Transferred Entities, used in preparing the Estimated Balance Sheet, Closing Balance Sheet and Final Purchase Price, included the unpaid "retention" amounts under LAD contract 2000RCC/13120US ("Shenhua Contract") for the sale of four continuous miner machines (the "Shenhua Miners" or "Jeffrey Miners") to Shenhua International Ltd. ("Shenhua" or "Shendong") for a combined price of $4,040,000. Marmon Stmt. ¶¶ 18; 86.

A continuous miner is basically a drum cutting machine used in coal mines to make tunnels and mine coal. It has a drum cutting device on the front of the machine driven by two electric cutter motors. Under that, the miner has gear boxes and a gathering pan that collects material cut from the mine face, and a conveyor system to transport the material from the front of the machine to the back, where it is discharged onto mobile transportation equipment. The continuous miner itself is mobile, and so it also has electric motors to drive the "tramming" system, which consists of left and right cat-track devices. The machine may be operated from an operator's station on the machine or remotely, with a radio device. Id. ¶ 87

13

The Shenhua Contract became effective September 8, 2000. The Shenhua Miners were delivered to Shenhua between March and May 2001. They were put into service in June 2001, just prior to the July 6, 2001 Closing Date. Id. ¶¶ 91, 92.

As a customer, Shenhua was one of DBT's "strategic priorities." While the Shenhua Miners were in operation, Shenhua was mining about 70,000,000 tons a year, and the figure later went to 100 million tons. Long-term projections showed Shenhua to be producing 200,000,000 tons a year which was the equivalent of two thirds of the total US underground production. According to one DBT employee, that is "a big, big coal reserve" and a big potential customer. Id. ¶ 88.

DBT alleges that, after the Closing Date, Shenhua made various claims that the continuous miners were defective or not operating as represented or warranted by LAD. Am. Compl. ¶ 26

On or about March 7, 2003, DBT America's President and CEO, William Tate, wrote Marmon's Gluth about warranty issues concerning the Shenhua Miners. Tate stated that "[f]ollowing delivery and installation of the equipment, start-up problems were experienced and remedied in the normal course." Marmon Stmt. ¶ 60; 93; Dep. Exhs. 46, 47, 61.

14

DBT alleges that Shenhua demanded that Plaintiffs repair the continuous miners, which efforts were unsuccessful, and that, after DBT's efforts to "remedy the defects" in the Shenhua Miners proved unsuccessful, "Shenhua invoked its right under the purchase agreement with LAD to reject the machines and receive a complete refund of the purchase price." Thereafter, DBT contends, DBT and Shenhua entered into the Shenhua Settlement. Marmon Stmt. ¶ 95; Am. Compl. ¶ 27, 29.

In this Action, DBT initially alleged that the Shenhua Settlement required DBT "to credit Shenhua for the replacement cost of the continuous miners and spare parts," and sought related damages of "at least $4,054,000." Marmon Stmt. ¶ 96.

DBT now alleges that the Shenhua Settlement required it (i) to credit Shenhua in the amount of $3,212,311 against two new continuous miners and spare parts and (ii) forego collection of the $404,000 (10%) retention on the purchase price of the Shenhua Miners. Id. ¶ 98.

The Shenhua Settlement is embodied in a "Protocol" dated March 5, 2003, and signed by DBT and Shenhua on or about March 18, 2003 (the "March 5 Protocol"). Among other things, the March 5 Protocol recites agreements made between DBT and Shenhua at a

15

meeting "concerning the quality of DBT equipment, spare parts, equipment rebuild [and] mine site services . . ." It states: "After discussion, it is decided to return the 4 continuous miner to DBT America against the delivery of new machines." The new machines were to incorporate the "most advanced technology," according to technical specifications defined by both parties' engineers. Id. ¶ 99.

DBT never supplied Shenhua with the two newly-designed continuous miners under the Shenhua Settlement. Instead, in December 2005, DBT and Shenhua applied the approximately $3.2 million credit against a shearer and other mining equipment supplied by DBT to Shenhua. DBT alleges the shearer was delivered to Shenhua in March 2003 and the other equipment was delivered throughout 2004 and 2005. Id. ¶ 100.

**The Majiliang Claim**

The accounts receivable of LAD and the Transferred Entities, used in preparing the Estimated Balance Sheet, Closing Balance Sheet and Final Purchase Price, included the unpaid "retention" amounts under the contract of sale for the Majiliang modular coal preparation plant ("MCPP") that is the subject of DBT's claims related to the "Majiliang Contract." Id. ¶ 18.

16

On or about April 20, 2000, LAD Australia entered into a contract with China Coal Import & Export Company ("China Coal"). Under the contract, LAD Australia agreed to provide MCPP equipment for the Datong Majiliang Coal Preparation Plant. DBT Stmt. ¶ 31.

The Majiliang Contract specified that the "product moisture content" in the coal processed by the MCPP system was to be less than 10% total moisture. Id. ¶ 32.

LAD Australia guaranteed that the process and equipment would meet with certain technical requirements, including the specified product moisture content. In Section 11.3 of the Majiliang Contract, LAD Australia agreed to "rectify or replace" defective equipment. Id. ¶ 33.

DBT alleges that China Coal complained to DBT in July, 2001, that the moisture content of the coal produced by the MCPP equipment furnished by LAD Australia was too high, and China Coal therefore refused to pay DBT $570,303 which came due when the MCPP was completed and commissioned, which occurred in May 2001. Id. ¶ 34.

It is undisputed that China Coal raised the issue in response to DBT's trying to recover the $570,303 debt from China

17

Coal, which was comprised of certain price retentions under the purchase contract for the Majiliang MCPP. Marmon Stmt. ¶ 258.

According to DBT, China Coal "made a claim" in September, 2002, based on the coal moisture content. Id. ¶ 249.

DBT asserts that it negotiated with China Coal to reach a compromise, and, by a letter of November 22, 2002, offered to discount the outstanding receivable by 25% for a full and final settlement and release of all claims under the Majiliang Contract. DBT Stmt. ¶¶ 37, 38. DBT asserts that China Coal rejected the offer in a letter of August, 2003, and in September, 2003, rather than face what it calculated as a $2 million claim from China Coal, DBT wrote off the outstanding balance of $570,303. Id. ¶¶ 39, 43.

It is undisputed that the write-off was not made in exchange for a release of the alleged Majiliang Claim. Marmon Stmt. ¶ 259. However, after DBT wrote off the receivable, China Coal did not tell DBT that DBT owed it money for the alleged losses. Id. ¶ 260; DBT Stmt. ¶ 43.

DBT gave Marmon a "List of Potential Retained Liabilities" as of February 27, 2003, which included an estimate that DBT faced a $2 million exposure on the Majiliang Claim. DBT

18

Stmt. ¶ 40. However, DBT never sought or obtained Marmon's consent to write off the China Coal receivable. Marmon Stmt. ¶ 261.

In 2003, DBT presented the Majiliang Claim to Marmon as a "legal claim" in which China Coal sought damages for alleged loss of profits or revenues as a result of excess moisture in certain coal China Coal had sold. DBT's February 27, 2003 list of potential retained liabilities stated that the Majiliang Claim amounted to approximately $2.1 million. Id. ¶¶ 251-52.

DBT alleges that it settled the Majiliang Claim by "agreeing to forego its right to further payment" of an account receivable in the amount of $787,852. DBT seeks recovery for this settlement amount, plus costs and attorneys' fees totaling $78,810. Id. ¶ 250; Am. Compl. ¶¶ 48, 50.

**The Rocksprings Feeder Breakers Claims**

In its Amended Complaint, DBT alleges generally that Marmon breached certain obligations to reimburse DBT for costs associated with warranty repairs and replacements both greater and lesser than $5,000. Marmon Stmt. ¶ 264.

One of DBT's warranty reimbursement claims concerns warranty costs allegedly incurred with respect to three coal mining

19

machines, called "feeder breakers," which were sold to Rocksprings Development, Inc. ("Rocksprings"). Id. ¶ 265.

DBT originally sought warranty costs for all three Rocksprings feeder breakers, but DBT now acknowledges that only the first feeder breaker was actually delivered to Rocksprings prior to the expiration of the applicable warranty. Id. ¶¶ 266; 268.

According to DBT's experts, the actual cost to replace the first feeder breaker totaled $193,987. Id. ¶ 269. According to the same experts, the feeder breakers needed to be replaced due to holes being worn through the side of the frame by the conveyor chain, cracked gear reducing housings and headshaft sprockets. Id. ¶ 273. The first frame failure occurred on June 11, 2002, after the expiration of the warranty period for the first feeder breaker machine. Id. ¶ 283. The frame failure was repaired. Id. ¶ 274.

DBT did not request or obtain Marmon's prior approval to provide a replacement machine to Rocksprings. Id. ¶ 287.

**Peabody Un-A-Haulers Claim**

DBT's claims include warranty costs allegedly incurred with respect to fourteen mining machines, known as "Un-A-Haulers," leased to Eastern Associated Coal Corp. ("Peabody" or "EACC").

20

Marmon Stmt. ¶ 288. DBT's seeks to recover $318,522 in connection with the Peabody Un-A-Haulers warranty claims. Id. ¶ 291. The Un-A-Haulers are owned by DBT, which purchased them from LAD in the Sale, and are leased to Peabody. Id. ¶ 292.

**The Brambles Claim**

In September, 1999, prior to the Closing Date of the GPA, LAD Australia entered into a contract with Brambles Australia Limited ("Brambles") to design and construct a coal conveyor and stacking facility (the "conveyor"). LAD Australia manufactured and supplied the conveyor prior to July 6, 2001, the Closing Date of the GPA. DBT Stmt. ¶ 46.

On or about December 5, 2002, Brambles brought suit in Australia Federal Court against DBT Australia and LAD Pty LTD, as successor in interest to LAD Australia, asserting claims of breach of contract, breach of warranty, negligence and statutory claims and seeking AUS $774,357 in damages (the "Brambles Claim"). Id. ¶ 47; Mills Decl. Ex. E.

Marmon admits that DBT notified it and gave it estimates of the amount of the Brambles Claim. DBT Stmt. ¶ 48, 49. Marmon also admits that it was not damaged or prejudiced in any way as a

21

result of the timing of DBT's notice regarding the Brambles Claim. Id. ¶ 50.

Brambles ultimately withdrew its claim and filed a notice of discontinuance with the Australian federal court. DBT paid no money to Brambles. Although there was no formal settlement agreement, Brambles has not re-filed. Id. ¶ 51, 52.

DBT has been billed for attorneys' fees and costs, in the amount of AUD $44,067, and consulting/expert fees of AUD $26,125 in defense of the Brambles claim. Marmon Opp. Stmt. ¶¶ 53, 54.

## I.    The Summary Judgment Standard

Summary judgment is granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); SCS Commc'ns, Inc. v. Herrick Co., 360 F.3d 329, 338 (2d Cir. 2004). The court will not try issues of fact on a motion for summary judgment, but, rather, will determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

22

As defendant, in order to prevail on its summary judgment motion, Marmon must demonstrate the absence of material evidence supporting an essential element of DBT's claim. Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003). On both motions, "[t]he party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." Rodriguez v. City of New York, 72 F.3d 1051, 1060-61 (2d Cir. 1995). Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted).

A material fact is one that "might affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; see also R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 57 (2d Cir. 1997). Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson,

23

477 U.S. at 248; see also Quarles v. Gen. Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985) ("the mere existence of factual issues -- where those issues are not material to the claims before the court -- will not suffice to defeat a motion for summary judgment"). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002). However, "the non-moving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful." Morris v. Lindau, 196 F.3d 102, 109 (2d Cir. 1999) (quotation omitted).

## II. **Breach of Contract Principles**

Under New York law, to establish a breach of contract, plaintiffs must show "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York, 375 F.3d 168, 177 (2d Cir. 2004). Judgment as a matter of law is appropriate where contract language is unambiguous. Photopaint Techs., LLC v. Smartlens Corp., 335 F.3d 152, 160 (2d Cir. 2003).

24

A contractual term is ambiguous "where it may be ascribed conflicting reasonable interpretations." Rogath v. Siebenmann, 129 F.3d 261, 267 (2d Cir. 1997) (quotation omitted). However, summary judgment is not necessarily precluded by an ambiguous contract term -- rather, "in order for the parties' intent to become an issue of fact barring summary judgment, there must also exist relevant extrinsic evidence of the parties' actual intent." Mellon Bank, N.A. v. United Bank Corp. of New York, 31 F.3d 113, 116 (2d Cir. 1994). The Court may resolve ambiguity in contractual language as a matter of law "if there is no extrinsic evidence to support one party's interpretation of the ambiguous language or if the extrinsic evidence is [so one-sided] that no reasonable factfinder could decide contrary to one party's interpretation." Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 159 (2d Cir. 2000). See also 3Com Corp. v. Banco do Brasil, S.A., 171 F.3d 739, 746-47 (2d Cir. 1999) ("As with any other factual issue, however, the court may resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary." (quotation and alterations omitted)).

## III. The Shenhua Settlement Is Not Recoverable

The parties' primary dispute is whether Marmon must indemnify DBT for the Shenhua Settlement. The GPA defines the scope of Marmon's duty to indemnify. As discussed below, the undisputed material facts demonstrate that the Shenhua Settlement does not meet the GPA's unambiguous contractual requirements for indemnification. Marmon is therefore entitled to summary judgment with regard to DBT's claims related to the Shenhua Settlement.

## GPA ¶ 3.10 Is Not a Basis for Recovery

Paragraph 3.10 of the GPA makes specific provision for DBT to undertake, on Marmon's behalf, "warranty repairs or replacements" under product warranties provided by LAD before the Sale ("Warranty Obligations"). Paragraph 3.10 requires that DBT "promptly notify" Marmon of any Warranty Obligations of which DBT became aware, and states that DBT "shall not undertake the fulfillment of any Warranty Obligations without the Sellers' prior approval if the estimated reimbursable cost thereof would be in excess of $5,000." Provided DBT complies with these requirements, it is entitled to recover its "direct costs" of providing warranty repairs or replacements, defined as "actual materials and labor" and a "reasonable charge for overhead." See GPA ¶ 3.10.

DBT does not seek reimbursement of the Shenhua Settlement as a warranty expense under GPA ¶ 3.10. DBT Opp. Stmt. ¶ 104. Nor

could it, for although DBT "advised Marmon generally at various times that Shenhua had raised issues concerning the continuous miners," Defendants' Responses to Plaintiffs' First Set of Requests for Admission 2, and DBT claims to have incurred over $800,000 of product warranty costs with regard to the continuous miners prior to the settlement with Shenhua, Am. Compl. ¶ 30, there is no dispute that "DBT did not make any written requests to Marmon for prior approval of warranty work performed on the four Shenhua miners." DBT Opp. Stmt. ¶ 113.[2] There is no dispute that the plain language of ¶ 3.10 requires such request and approval.

Moreover, the Shenhua Settlement allowance does not reflect DBT's "direct costs" of the materials and labor it provided in making repairs or replacements on the Shenhua Miners. Paragraph 3.10 defines direct costs as "inclusive of actual costs of materials and labor, including a reasonable charge for overhead."

---

2 In opposition to Defendants' Motion for Summary Judgment, DBT for the first time asserts that its claims in this lawsuit include the $805,670 in "product warranty costs" allegedly incurred for the continuous miners prior to the Shenhua settlement. See Pl. Opp. Mem. 20-34. DBT cannot raise this claim for the first time at this stage of proceedings. See Beckman v. U.S. Postal Service, 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000) ("Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment." (internal quotations omitted)). DBT argues that it did previously raise the claim, pointing to language in the Amended Complaint stating "Moreover, these amounts do not include $805,670 of product warranty costs incurred by Plaintiffs incurred [sic] for the continuous miners prior to the settlement with Shenhua." Am. Compl. ¶ 30. This language, which on its face indicates that the $805,670 is not included in DBT's claim, falls short of providing the notice required by the Federal Rules of Civil Procedure. See Conley v. Gibson, 355 U.S. 41, 47 (1957). This is particularly so in light of the fact that the computation of damages in Plaintiffs' Initial Disclosures does not include these costs, and DBT has not amended the disclosures to include them. See Plaintiffs' Initial Disclosures (Dep. Ex. 35) 6.

27

DBT admits that the Shenhua Settlement does not reflect the "product warranty costs incurred by Plaintiffs . . . for the continuous miners prior to the settlement with Shenhua." Am. Compl. ¶ 30. Rather, the settlement for which DBT seeks indemnity is essentially a refund to Shenhua: approximately $400,000 of which was to be set off against receivables still owing by Shenhua on the miners, and the rest to be put toward the cost of new customized machines. Marmon Stmt. ¶ 99.[3]

DBT argues that the Shenhua Settlement does not have a "profit" component, implying that it therefore qualifies as a "direct cost." Pl. Opp. 8. Whether or not there was in fact a "profit" component to the Shenhua Settlement, the refund credit given to Shenhua clearly did not reflect "actual costs of materials and labor, including a reasonable charge for overhead." Accordingly, the Shenhua Settlement is not recoverable under GPA ¶ 3.10.

**GPA Article VII Does Not Provide An Independent Basis of Recovery for Third Party Warranty Claims**

---

3 DBT did not ultimately provide Shenhua with the two continuous miners under the Shenhua Settlement, and instead applied the approximately $3.2 million credit against other mining equipment supplied by DBT to Shenhua. Id. ¶ 100.

DBT asserts that the Shenhua Settlement is independently recoverable under the general indemnification provisions of GPA Article VII. It is not. GPA ¶ 3.10 sets forth a process for reimbursement of warranty claims requiring, among other things, Marmon's prior approval of warranty obligations with estimated costs over $5,000. GPA ¶ 3.10 must be satisfied as a prerequisite to any warranty-related indemnification claim under Article VII.

A contrary result would simply erase ¶ 3.10 from the contract. Such a result would run afoul of the fundamental rule that a contract should be interpreted in a manner that gives meaning to every provision. As New York's Court of Appeals stated:

> The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect. Even if there was an inconsistency between a specific provision and a general provision of a contract (we find none), the specific provision controls.

Muzak Corp. v. Hotel Taft Corp., 1 N.Y.2d 42, 46 (1956) (citations omitted); see also Saffire Corp. v. Newkidco, LLC, 286 F. Supp. 2d 302, 308 (S.D.N.Y. 2003) (granting summary judgment and noting that "if Newkidco could avoid the obligations agreed to under the early termination provision by simply discontinuing payments, this would defeat the purpose of the provision and render it meaningless"); Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs., 63 N.Y.2d 396, 403 (1984).

DBT seeks to avoid the specific requirements of ¶ 3.10 by characterizing the Shenhua Settlement as a settlement of Shenhua's potential claim for breach of contract. However, the only provision of the Shenhua contract that DBT points to is the warranty provision. Pl.'s Mot. Summ. J. 3-4. DBT relies on Section 13.1 of the Shenhua Contract, which reads:

> The seller shall guarantee that the Goods supplied under the Contract are brand new, unused and have no defect arising from improper design, materials or workmanship or from any act or omission of the Seller that may develop under normal use, and comply in all respects with quality, specification and performance stipulate[d] in the Contract. The Seller shall further guarantee that the Goods, when correctly mounted under the seller's supervision and properly operated and maintained according to the manuals furnished by the Seller under the Contract will be successfully commissioned and duly acceptable to the Buyer's satisfaction and shall give satisfactory performance during its life.

Dep. Ex. 53. This provision clearly constitutes a warranty under New York law. Under the Uniform Commercial Code as adopted by New York, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise," N.Y. U.C.C. § 2-313(1)(a) (McKinney 2001), and ¶ 3.10's specific notice and approval requirements are applicable. Characterizing customer warranty claims as potential claims for breach of contract does not obviate the ¶ 3.10 requirements.

**Marmon Did Not Agree To Modify or Waive the Prior Approval Requirement of GPA ¶ 3.10**

DBT also argues that Marmon waived or modified the GPA's requirement of prior approval. Am. Compl. ¶¶ 85-86. The undisputed facts defeat that allegation. Marmon Stmt. ¶¶ 43-71.

DBT argues that the parties modified or waived the "prior approval" provision of GPA ¶ 3.10 in or around February, 2002, by a document titled "Additional DBT Warranty Policy Procedures For Submission to Marmon" (Dep. Ex. 17). Whether or not that document constitutes an amendment to the GPA, it explicitly states that "[a]ll warranty procedures as set forth in the contract continue as requirements for reimbursement by Marmon." Marmon Stmt. ¶ 50; Dep. Ex. 17.[4] Thus, the very writing relied on by DBT states explicitly that the requirements of GPA ¶ 3.10 are still in effect. The Additional Procedures document goes on to specify information that DBT should supply to facilitate Marmon's prior approval of warranty expenses over $5,000. See id. It is plain on the face of the Additional Procedures document that it does not abrogate the requirements of GPA ¶ 3.10; if anything, it supplements them. Furthermore, it is undisputed that after DBT circulated the

---

4 The Additional Procedures document also states: "The current warranty forms will continue to be used and submitted to Marmon for authorization. These forms continue to be required for all claims in excess of $5,000 dollars US." Dep. Ex. 17.

Additional Procedures document, it continued to seek Marmon's prior approval of warranty expenses exceeding $5,000. Marmon Stmt. ¶¶ 57-58.

DBT argues in the alternative that, if the Additional Procedures document does not constitute a written modification of the GPA, the parties nevertheless agreed to an oral modification of the GPA which was subsequently relied upon by DBT in performance of the contract.

It is not clear whether DBT's argument is that the Additional Procedures document embodies the purported oral modification, or whether the purported oral modification is in some manner separate and distinct. In either event, the argument fails. If the purported oral modification is reflected in the Additional Procedures document, the argument fails for the same reason as the above: that document explicitly and unambiguously disclaims any intention to waive or modify the prior approval requirement of GPA ¶ 3.10. To the extent that DBT asserts the existence of an oral modification with terms distinct from the Additional Procedures document, it has failed to define adequately the contours of the purported modification. The alleged oral modification therefore fails to meet the contractual requirements of definiteness under New York law and is unenforceable. See Wechsler v. Hunt Health Sys., Ltd., 186 F. Supp. 2d 402, 411 (S.D.N.Y. 2002) (denying

32

motion for reconsideration where movant failed to define adequately the contours of purported oral modification of contract); John Street Leasehold LLC v. F.D.I.C., No. 95 Civ. 10174, 1998 WL 411328, at *3-4 (S.D.N.Y. July 22, 1998) (holding that an alleged oral agreement was to vague to be enforced by the court), aff'd 196 F.3d 379 (2d Cir. 1999).

Furthermore, paragraph 9.2 of the GPA states that the contract "may not be amended, modified or supplemented except by a written agreement of the parties . . . ." New York law does not permit oral modification when the original written agreement so provides that modifications must be in writing. N.Y. Gen. Oblig. Law § 15-301(1) (McKinney 2001); see also John Street Leasehold LLC v. F.D.I.C., 196 F.3d 379, 382 (2d Cir. 1999). The writing requirement may be overcome by a showing of either part performance or equitable estoppel, but only where the subsequent performance or reliance is "unequivocally referable to the modification." Id.

Here, the undisputed evidence indicates that DBT never changed its policy with regard to submission of warranty claims for Marmon's prior approval. As noted above, it is undisputed that DBT continued to submit warranty forms for prior approval of warranty expenses exceeding $5,000 after agreeing to the Additional Procedures document. Marmon Stmt. ¶¶ 57-58. Furthermore, that document clearly states that the requirements of ¶ 3.10 are

33

unchanged and that prior approval for claims exceeding $5,000 is still required. Finally, DBT admits that the Guideline circulated by Dorothea Gattineau and the Additional Procedures document are the only guidelines that DBT circulated internally regarding handling of warranty claims under the GPA. Marmon Stmt. ¶ 55; Dep. Ex. 17; 113. Both of those documents explicitly acknowledge ¶ 3.10's prior approval requirement. DBT's failure to present any evidence that Marmon waived the prior approval requirement precludes a determination that DBT relied on such a waiver.

## Submission for Prior Approval Is a Condition Precedent to Indemnification for Warranty Claims Exceeding $5,000

DBT also contends that its failure to comply with the "prior approval" requirement of ¶ 3.10 is irrelevant, because such compliance is not a condition precedent to indemnification for warranty claims exceeding $5,000. As set forth below, the contrary conclusion is reached.

A condition precedent is "an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co., 660 N.E.2d 415, 418 (N.Y. 1995) (quotation omitted); U.S. Fid. and Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 34, 51 (2d Cir.

34

2004). Conditions can be express or implied. "Express conditions must be literally performed, whereas constructive conditions, which ordinarily arise from language of promise, are subject to the precept that substantial compliance is sufficient." Oppenheimer, 660 N.E.2d at 418; see also Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 597-601 (2d Cir. 2005) (holding that contractual requirement of third-party consent was a condition precedent to creation of the contract at issue); Jungmann & Co. v. Atterbury Bros., 163 N.E. 123 (N.Y. 1928) (holding that where a contract of sale provided that plaintiff should advise defendant by cable of shipment, plaintiff could not recover on its contract without proof that it performed all conditions precedent, including that of giving notice according to the terms of the contract).

> The reason for [literal performance of express conditions] is obvious. . . . The condition is part of the promise qualifying and limiting it, and the promise, as a matter of plain fact, is not broken until the condition has happened or has been performed. A party to a contract cannot have the benefit of favorable provisions and ignore its conditions which are to be performed by that party or which must occur before its benefits are due.

13 Richard A. Lord, Williston on Contracts § 38:6 (4th ed. 2007).

Here, paragraph 3.10 unambiguously requires Marmon's prior approval for reimbursement of warranty claims in excess of $5,000: "Purchasers shall not undertake the fulfillment of any Warranty Obligation without the Sellers' prior approval if the estimated reimbursable cost thereof would be in excess of $5,000."

35

GPA ¶3.10.  There is no evidence that DBT believed otherwise: all
of its internal guidance reflected the prior approval requirement,
and DBT does not dispute that it sought such approval for some
warranty claims.  See Marmon Stmt. ¶¶ 53-58.

Finally, DBT argues that its failure to comply with the prior
approval provision should be excused to avoid "a disproportionate
forfeiture."  Where contractual language is clear, the Court may
excuse the nonoccurrence of a condition by waiver, breach or
forfeiture.  Oppenheimer, 660 N.E.2d at 418.  In this context,
"forfeiture" is defined as "the denial of compensation that results
when the obligee loses [its] right to the agreed exchange after
[it] has relied substantially, as by preparation or performance on
the expectation of that exchange."  Id. at 419 n. 2 (quoting
Restatement (Second) Contracts § 229, comment b (1981), alterations
in original); see also Aetna, 404 F.3d at 601.  As described above,
DBT has failed to allege facts indicating that it reasonably relied
on the inapplicability of the prior approval provision.  There is
thus no basis for a determination of forfeiture here.

Defendants are therefore entitled to summary judgment on
Plaintiffs' claims related to the Shenhua Settlement.

**IV    The Majiliang Claim Is Not Recoverable**

**DBT Failed To Comply with GPA ¶ 3.14**

Under GPA ¶ 3.14, DBT agreed to "use commercially reasonable efforts . . . to collect all accounts receivable shown on the Closing Balance Sheet," and was not permitted to "allow any claim against or agree to any reduction in or set off against any such receivable in excess of $5,000 without [Marmon's] prior consent." DBT admits that it never sought or obtained Marmon's consent to write off the China Coal receivable. Marmon Stmt. ¶ 261.

DBT argues that the "prior consent" requirement for receivables reductions was intended to ensure that DBT used its best efforts to collect receivables within a year of the Closing, so that Marmon would not be unfairly compelled to make up the difference between DBT's collections and the 80% minimum under ¶ 3.14's guarantee provision.[5] Thus, DBT argues that the Court should read the "prior consent" requirement to have expired when it became clear that Marmon was not liable under the guarantee.

---

5 The guarantee language in GPA ¶ 3.14 states:

In the event that, as of the first anniversary of the Closing Date, the Purchasers shall have collected less than 80% of the aggregate dollar amount of such accounts receivable, net of the reserves shown on the Closing Balance Sheet (the "Guaranteed Amount"), the Purchasers shall so notify the Sellers in writing, and the Sellers shall promptly pay to the Purchasers an amount equal to the difference between the aggregate dollar amount collected by the Purchasers with regard to such accounts receivable and the Guaranteed Amount.

37

DBT's argument fails because the "prior consent" provision of ¶ 3.14 is unambiguous. Although the guarantee in ¶ 3.14 may expire after a year, the requirement that DBT obtain prior consent to write off accounts receivable plainly does not. DBT's argument as to purpose cannot inject ambiguity into a contractual provision whose meaning is clear on its face. See Reiss v. Fin. Performance Corp., 764 N.E.2d 958, 961 (N.Y. 2001) ("courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing" (quotations omitted)). See also Strumlauf v. Sandine Originals Inc., 434 N.E.2d 268, 268 (N.Y. 1982) (Fuchsberg, J., dissenting) ("it is almost hornbook law that the intent of the parties to a written agreement is to be found primarily in their 'expressed words' rather than their 'subjective intent'"); 11 Williston on Contracts § 32:6 (4th ed. 2007) ("Under the principle of *noscitur a sociis,* the meaning of unclear words may be gleaned by reference to other words associated with them, but the doctrine may not be used to create uncertainty in an otherwise unambiguous term.").[6]

Because DBT failed to request prior consent for the write-off of China Coal's outstanding balance, Defendants are

---

6 Marmon argues that the purpose of the "prior consent" provision was to protect it from claims that it was obliged to pay for DBT's sales concessions to customers. Marmon's explanation is every bit as reasonable as DBT's, and of course has the additional benefit of being consistent with the plain meaning of the contract language.

entitled to summary judgment on Plaintiffs' claims related to the Majiliang Claim.

## GPA ¶ 3.10 Bars the Majiliang Claim

The Majiliang Claim is also barred by GPA ¶ 3.10. Writing off the China Coal receivable was not a "direct cost" of any repair or replacement. Nor did DBT ask Marmon to approve the write-off in advance as an over-$5,000 warranty reimbursement item, and Marmon did not approve the write-off as a Warranty Obligation under ¶ 3.10. See Marmon Stmt. ¶ 261.

## V The Rocksprings Feeder Breakers Claim Is Not Recoverable

Marmon is entitled to summary judgment as to any claims related to the Rocksprings Feeder Breakers to the extent that DBT did not comply with the notice and approval provisions of GPA ¶ 3.10, as discussed above. DBT admits that it did not obtain Marmon's prior approval to provide a replacement machine to Rocksprings, see Marmon Stmt. ¶ 287, therefore DBT is not entitled to indemnification as to the cost of that replacement. Similarly, DBT is not entitled to indemnification for any claim related to frame failure in the first feeder breaker, because DBT admits that such frame failure occurred after the expiration of the machine's warranty. Id. ¶ 283.

## VI   The Peabody Un-A-Haulers Claim Is Not Recoverable

Defendants are entitled to summary judgment on the Peabody Un-A-Haulers Claim because Plaintiffs have failed to adduce evidence of any warranty. It is undisputed that the Un-A-Haulers were sold by LAD to DBT, and leased to the Eastern Associated Coal Corp. ("EACC" or "Peabody"). Marmon Stmt. ¶ 292. DBT has not produced the executed Peabody lease, though it has produced an unsigned version. See Declaration of Aloysius D. Amrhein, executed July 27, 2007, Ex. A ("Peabody Lease"). Assuming this is in fact the document executed by the parties, Defendants are entitled to summary judgment on the grounds that there is no warranty in the contract.

> The Peabody Lease includes a "parts program," under which
>
> Long-Airdox shall provide all repair parts and components that may be required for the repair and maintenance of the Equipment, except for those consumables listed below. The cost of said repair parts and components is included in the Schedule of Rates set forth in Section 1 of Exhibit B.

Peabody Lease ¶ 9.2.[7] Under the Lease Agreement, LAD was to be paid a set amount per ton of raw coal mined from a given mine during the life of the contract, subject to a certain minimum payment. See id., Ex. B. Exhibit B calculates the rate of payment

---

7 The referenced "consumables" were filters, tires, oil and grease, distilled

as $1.15 per ton, which is comprised of an $.85 per ton fee for "Equipment and Exchanges" and $.30 per ton fee for "Parts." Id., Ex. B ¶ 1. Also under Exhibit B, LAD agreed that upon termination of the Peabody Lease, it would calculate the actual cost of all parts and repairs incurred on the machinery supplied to Peabody, and if it was less than the amount paid by Peabody based on tonnage production for parts (at $.30 per ton), repay 50% of the excess cost. See id., Ex. B ¶ 4.

LAD and DBT, as its successor in interest, thereby agreed to be responsible for all repairs and replacements of the Un-A-Haulers under the Peabody Lease, and received separate consideration for that obligation. As such, the structure of the leasing agreement was not such that the lessee, Peabody, would have any cause to assert a warranty claim. Unsurprisingly, there no evidence that Peabody ever in fact asserted a warranty claim.

DBT asserts that the Peabody Lease does contain a warranty, relying on the following language: "Long-Airdox and EACC represent that each item of Equipment is of the size, design and capacity selected by EACC, and that the same is suitable for the purposes for which it was selected by EACC." Id. ¶ 13. While the meaning of this sentence is not entirely clear, it does not constitute a warranty running from LAD to EACC, as it indicates

water, dust hoses, hoses and fittings, and electric trailing cables. Id.

that BOTH parties to the contract are making the same representation. Furthermore, and conclusively, the Peabody Lease contains an unambiguous disclaimer of warranties: "LONG-AIRDOX MAKES NO EXPRESS WARRANTIES AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY FOR A PARTICULAR PURPOSE, QUALITY OR OTHERWISE ARE EXPRESSLY EXCLUDED." Id. In light of this clear and explicit disclaimer of warranties, as well as the structure of the lease agreement as described above, there is no factual basis for DBT's indemnification claim.

## VII  The Brambles Claim Is Recoverable

Marmon does not dispute that any claim under the Brambles contract constitutes a Retained Liability, that DBT provided notice sufficient to satisfy Article VII, or that Brambles did in fact bring suit in Australian Federal Court. Marmon's only challenge to the Brambles Claim is that DBT initially demanded that Marmon pay it $387,179 on this claim, and demanded the same amount in this action, alleging that the claim had been "settled for US $387,179.00." See Compl.¶ 38. DBT also initially sought its attorneys' and experts' fees at the current exchange rate, though it now concedes that any damages award should apply the exchange rate at the time of the breach. Marmon asserts that DBT's "overreaching" amounted to a breach of its duties of good faith and cooperation to Marmon. For the reasons explained below, Marmon has

42

failed to demonstrate any breach of the duties of cooperation or good faith and fair dealing. DBT is therefore entitled to summary judgment on the Brambles Claim.

## VIII Marmon's Motion To Dismiss the Complaint In Its Entirety Is Denied

### Marmon Has Not Established that DBT Breached Its Duties of Cooperation or Good Faith and Fair Dealing

Marmon argues that DBT's claims should be dismissed in their entirety due to DBT's breach of its duties of cooperation and good faith and fair dealing. The argument is primarily based on a document provided by DBT to Marmon, titled "List of potential retained liabilities as per February 27, 2003" (the "List"). Dep. Ex. 50. Marmon argues that the dollar value of numerous claims reflected on the list were inflated, and relies on DBT's subsequent downward adjustment of those figures as proof that such claims were made in bad faith. Marmon similarly relies on the fact that DBT has made similar downward adjustments to a number of its claims in this lawsuit.

### Duty of Cooperation

To establish DBT's duty of cooperation, Marmon relies on the following two provisions of the GPA:

> Upon the terms and subject to the conditions of
> this Agreement, each of the parties hereto shall
> use all commercially reasonable efforts to take or
> cause to be taken all action, and to do or cause to
> be done, and to assist and cooperate with the other
> party in doing, all things necessary, proper or
> advisable to consummate and make effective as
> promptly as practicable the transactions
> contemplated by this Agreement.

GPA ¶ 3.3(a).

> The Purchasers further agree that after the Closing
> they shall, and shall cause the Transferred
> Entities to, reasonable cooperate with and provide
> assistance to the Sellers in connection with pre-
> Closing matters, including those relating to or
> constituting a Retained Liability.

GPA ¶ 3.6(b).


**Duty of Good Faith and Fair Dealing**


Under New York law, "implicit in all contracts is a
covenant of good faith and fair dealing in the course of the
contract performance." Dalton v. Educ. Testing Serv., 663 N.E.2d
289, 291 (N.Y. 1995). This implied obligation encompasses the
performance of "any promises which a reasonable person in the
position of the promisee would be justified in understanding were
included." Rowe v. Great Atl. & Pac. Tea Co., Inc., 385 N.E.2d
566, 569 (N.Y. 1978) (quotation omitted). It also encompasses the
obligation that "neither party shall do anything which will have
the effect of destroying or injuring the right of the other party
to receive the fruits of the contract." Kirke La Shelle Co. v.

44

Paul Armstrong Co., 188 N.E. 163, 167 (N.Y. 1933). "In general, courts enforce the implied covenant where an implied promise was so interwoven in the whole writing of a contract as to be necessary for effectuation of the purposes of the contract." M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990) (per curiam).

> Nonetheless, a party who asserts the existence of an implied-in-fact covenant bears a heavy burden, for it is not the function of the courts to remake the contract agreed to by the parties, but rather to enforce it as it exists. Thus, a party making such a claim must prove not merely that it would have been better or more sensible to include such a covenant, but rather that the particular unexpressed promise sought to be enforced is in fact implicit in the agreement viewed as a whole.

Rowe, 385 N.E.2d at 570.

Marmon argues that DBT breached these duties by asserting excessive claims for indemnity, which "placed an untenable burden on Marmon to review and evaluate DBT's claims and separate the good from the bad." Def. Mot. Summ. J. 29. However, the claims provisions described above, including paragraphs 3.10 and 3.14, Article VII and the access to information provision of paragraph 3.6, as well as the Additional Procedures document later agreed to by the parties, demonstrate that the parties intended that this very "burden" rest with Marmon. The GPA contemplated a process whereby DBT would submit warranty and other indemnification claims to Marmon, which had a right to access to the books and records of DBT "for any reasonable purpose." GPA ¶ 3.6(b). As noted

45

previously, Marmon also had a right to prior approval of certain warranty claims and write-offs of accounts receivable, and numerous rights with regard to claims made under Article VII (including the right to assume the defense of such claims).

Marmon also argues that, had it presumed that DBT was acting in good faith and paid the amounts demanded, Marmon would have been cheated out of millions of dollars. However, Marmon has failed to establish that it had any right, contractual or otherwise, to so rely on DBT's estimates of potential liability for third party claims. Again, the contractual provisions listed above provided safeguards by which Marmon was able to, and did in fact, challenge the legitimacy of DBT's indemnity claims.

As such, Marmon's motion to dismiss the complaint based on breaches of the duties of cooperation, good faith and fair dealing is denied.

## Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted as to Plaintiffs' claims regarding (i) the Shenhua Settlement; (ii) the Majiliang modular coal preparation plant; (iii) the Rocksprings feeder breakers; and (iv) the Peabody Un-A-Haulers, and such claims are dismissed. Defendants' motion is

46

denied to the extent that it seeks to dismiss the Complaint in its entirety.    Plaintiffs' Motion for Partial Summary Judgment is granted as to the Brambles Claim and is otherwise denied.    It appears that the remaining claims have been settled or withdrawn.

Submit judgment on notice.

It is so ordered.

**New York, NY**
**April 7, 2008**

ROBERT W. SWEET
**U.S.D.J.**

47